UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

SHAWN D. MOORE

       Plaintiff,

v.                                                                CIV 10-0539 BB/KBM

SERGEANT AARON BELL,
MICHAEL GATTI,
LIEUTENANT JOE PACHECO,
CORRECTIONAL OFFICER JASON GARCIA,
CORRECTIONAL OFFICER FNU MORA,

       Defendants.

# PROPOSED FINDINGS
# &
# RECOMMENDED DISPOSITION

This prisoner civil rights matter under 42 U.S.C. § 1983 is before the Court on Plaintiff's Complaint and other filings that supplement his claims, as well as Defendants' motion to dismiss and accompanying *Martinez* Report. *See Docs. 1, 8, 29, 30.* The entire record and relevant law have been carefully considered. I find that Defendants have not demonstrated Plaintiff failed to exhaust available grievance procedures, and that their arguments for dismissing the Eighth Amendment excessive use of force claim are largely superceded and also without merit. Accordingly, I recommend that their motion should be denied, and the matter referred to the *Pro Bono* Selection Committee for possible appointment of counsel.

# I.  Introduction

Defendants did not submit Plaintiff's entire prison file with the *Martinez* Report. However, what was submitted underscores my earlier observation that Plaintiff has a contentious relationship with correctional officers.  Those submissions suggest that Plaintiff has a history of being unable or unwilling to understand certain prison rules; they clearly demonstrate that he can become quarrelsome and lash out at staff.  *See, e.g., Docs. 29-3, 29-7.*  Indeed, Plaintiff himself submitted evidence supporting these conclusions.  His more than 250-page response to the *Martinez* Report, for example, contains hundreds of pages that document disciplinary incidents and disputes with staff.  *See Docs. 31-1, 31-2, 31-3, 31-4, 31-5, 31-6, 31-7, 31-8, 31-9, 31-10.*

Plaintiff's claims fall into two general categories – "harassment" and "excessive use of force."  In an earlier order, I summarized my understanding of Plaintiff's claims of "harassment" based on the specific allegations he made, including that certain Defendants have not processed his grievances and threatened him in order to dissuade him from filing grievances.  Plaintiff's main claim, however, is that, after a physical altercation where he admittedly kicked at Defendant Officer Jason Garcia, Defendant Sergeant Aaron Bell and Defendant Officer Mora[1] engaged in excessive force while escorting Plaintiff to the medical unit.  *See Doc. 15 at 1-3.*

Defendants' arguments mirror the two categories, and they ask the Court to dismiss the entire action with prejudice and grant them attorney fees.  *See Doc. 29 at 12.*  With respect to the "harassment" category of claims, Defendants specifically assert that, although Plaintiff initiated prison administrative procedures by filing some grievances, he failed appeal them.  *See id.* at 8-

---

[1]  Defendants have yet to formally identify Officer Mora's first name for the record.  According to certain *Martinez* Report submissions and other court records, I believe his first name is "Osvaldo" or "Oswaldo."  *See Doc. 29-6* at 10; *Luna v. Lindsey,* CIV 09-353 MCA/CG (caption).

9.  With respect to the excessive use of force claim, they contend that Plaintiff initiated the force

used by kicking at Officer Garcia and that the *de minimus* force used in response did not result in

any injury.  *See id.* at 11-12.

## II.  Proper Procedural Posture & Standard Of Review

In their introductory arguments, Defendants assert that this action should be dismissed

because Plaintiff's allegations fail to "state a claim."  They do so in part on the ground that

Plaintiff's claims are "conclusory."  *See Doc. 29* at 5-6.  They made the same observation in

their Answer.  In response, I agreed that the "Complaint is not easy to decipher," but I also

pointed out for Defendants the specific allegations Plaintiff did raise in support of his claim for

"harassment" and "excessive force."  *Doc. 24* at 3.  Thus, there is no basis for Defendants to now

argue that the Complaint is "conclusory."  *See, e.g., Gonzalez-Liranza v. Naranjo*, 2000 WL

488476 at * 2, n.3 ("We recognize that allegations in a complaint will not create a factual issue if

they are conclusory . . .  The allegations in Mr Gonzalez' complaint, however, are specific.")

(citing *Hall v. Belmon,* 935 F.2d 1106, 1111 (10th Cir. 1991)).

Also, notwithstanding that Defendants captioned their motion as one to "dismiss," this

case is in the posture of summary judgment.  When the majority of the Defendants filed their

Answer, they did not move to dismiss.  *See Doc. 23; see also* FED. R. CIV. P. 12(b) (motion

asserting defense of failure to state a claim "must be made before pleading if a responsive

pleading is allowed"); *id.,* 12(a) (answer is a "responsive pleading").  Accordingly, this Court

ordered a *Martinez* Report and, in so doing, specifically gave the parties notice that it "may be

used in deciding whether to grant summary judgment on Plaintiff's claims."  *See Doc. 24* at 4.

Moreover, Defendants' arguments for dismissal rely on materials submitted with the *Martinez*

Report, which constitute matters "outside" the pleadings  Thus, their motion should be construed as one for summary judgment.[2]

Plaintiff's Complaint uses the form that ends with a "declaration under penalty of perjury" that the information in the Complaint "is true and correct."  *Doc. 1* at 11.[3]  As such, the Complaint is a "verified" pleading that is treated as an affidavit for summary judgment purposes. *See, e.g., Hall,* 935 F.2d at 1111 (and cases cited therein).  The *Martinez* Report is also treated as an affidavit for summary judgment purposes.  *See, e.g., id.*  Where the specific and material factual allegations in the Complaint and the *Martinez* Report conflict, this Court cannot rely on the *Martinez* Report to resolve them and enter summary judgment.  *E.g., id.* at 1109; *see also, e.g., Breedlove v. Costner,* 2010 WL 5173824 at * 3 (10th Cir. 2010) (citing *Hall* and *Northington v. Jackson,* 973 F.2d 1518, 1521 (10th Cir. 1992)), *petition for cert. filed 3/9/11; Gonzalez-Liranza,* 2000 WL at * 2 (citing *Hall, Green v. Branson,* 108 F.3d 1296, 1302 (10th

---

[2]  *See* Fed. R. Civ. P. 12(d) (for motion to dismiss for failure to state a claim, if "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56"); *see also, e.g., Ketchum v. Cruz,* 961 F.2d 916, 919 (10th Cir. 1992) (noting federal rule 12 and holding "[t]hus, because the district court considered the *Martinez* report, a document outside the pleadings, defendant's motion to dismiss was properly converted by the district court to a motion for summary judgment."); *compare Gee v. Pacheco,* 627 F.3d 1178, 1187 (10th Cir. 2010) (noting general exceptions where court can consider materials outside complaint on a motion to dismiss, and the narrow exception concerning *Martinez* Reports:  where prisoner "challenges a prison's policies or established procedures and the *Martinez* report's description of the policies or procedures remains undisputed after plaintiff has an opportunity to respond") (omitting internal quotations to *Hall,* 935 F.2d at 1112).

[3]  The declaration is signed by Plaintiff, but not notarized.  This does not undermine the effect of the effect of the declaration.  Among other statutes, the declaration cites 28 U.S.C. § 1746, which governs unsworn declarations.  Under § 1746, any matter that can be supported by an affidavit can be established by an unsworn statement, so long as it is accompanied by a declaration that it was made "under penalty of perjury" and is "true and correct."  Section 1746 does not require the statement to be notarized.  *See Doc. 1* at 11; *see also Howell v. New Mexico Dept. of Aging & Long Term Services,* 398 Fed. App'x 355, 359 (10th Cir. 2010) (document that is "not in the form of an affidavit or an unsworn declaration [under] 1746" could not be considered for summary judgment purposes); *Martinez v. Edmondson,* 388 Fed. App'x 828, 829 (10th Cir. 2010) (prisoner could show timely filing either "by a declaration in compliance with . . . § 1746 *or* by a notarized statement") (emphasis added).

Cir. 1997), *Hayes v. Marriott,* 70 F.3d 1144, 1146 (10th Cir. 1995), and *Mosier v. Maynard,* 937 F.2d 1521, 1524 (10th Cir. 1991)).  The same is true if a material factual allegation in a verified complaint remains unrebutted by the *Martinez* Report.  *E.g., Smith v. Saffle,* 1993 WL 59300 at *2, n.2 (10th Cir. 1993) ("summary judgment would have been inappropriate in light of plaintiff's claim that he was required to lie in his own excrement during the time he was restrained, a claim unrebutted anywhere in the record").

# III.  Applicable Grievance Policies
## and
## Plaintiff's Grievances According To Defendants

The applicable New Mexico Corrections Department grievance procedures here are the same as those noted in a recent Tenth Circuit opinion.  *See Flores v. Delevarquez,* 370 Fed. App'x 968, 969 (10th Cir. 2010); *see also Doc. 29-2* at 3-10 (overview of grievance policy) (hereinafter "*Policy CD-150500*"); *id.* at 11-16 (grievance policy steps) (hereinafter "*Policy CD-150501*"); *id.* at 17-20 (examples of required grievance forms) (hereinafter "*Form CD-150501.x*"); *id.* at 21-23 (attachments A -C of required grievance logs) (hereinafter "*Attachment CD-150501.x*").

The process comprises three main steps.  First, the inmate must first file an informal grievance within a certain time, using a certain form.  Informal grievances are directed to a "unit manager" for resolution and are reviewed by "staff."  *See Policy CD-150501,* ¶¶  A.1-A.2; *see also Form CD-150501.3.*  If the matter is not resolved, then the inmate may file a formal grievance within a certain time, using a different form.  Formal grievances are directed to the "Grievance Officer," who reviews the matter and makes a recommendation to the Warden.   *See Policy CD-150501,* ¶¶  A.3, B.1-B.4; *see also Form CD-150501.1* at 1-2.  The Warden makes

the ultimate decision whether to deny, grant, dismiss, resolve, or refer the formal grievance. *See Policy CD-150501,* ¶¶ C.1-C.8; *see also Form CD-150501.1* at 2. If the Warden's decision is unsatisfactory to the inmate, he or she may file an appeal to the Office of the Secretary of Corrections within a certain time by filling out the appeal portion of the formal grievance form. *See Policy CD-150501,* ¶¶ D.1-D.8; *see also Form CD-150501.1* at 2.

The New Mexico procedures expressly require each penal institution to maintain records of grievances on two log formats. *See Policy CD-150501,* ¶ F.2. This record keeping enables the Director of Adult Prisons Division to "determine the extent of [the institution's] compliance with [the grievance] policy." *Id.*, ¶ F.4. Other purposes of the grievance procedure are to: "resolve grievances at the lowest possible level," *Policy CD-150500,* ¶ E; prohibit inmates from being subjected to "retaliation, reprisal or discipline for the legitimate use of the grievance procedure," *id.,* ¶ J.A; and subject employees who do so "to disciplinary action," *id.* ¶ J.B.

An affidavit by Grievance Appeals Coordinator Ralph Casaus discusses certain of Plaintiff's grievances and asserts they were not fully exhausted. The grievances are attached to his affidavit. The affidavit does not cite the grievance file number, describe the specific subject of the grievance, or note the date of the incident. Instead, the affidavit describes eight "staff harassment" grievances by date: November 24, 2008; March 16, 2009; April 3, 2009; another on April 3, 2009; June 30, 2009; July 7, 2009; July 23, 2009; and June 24, 2010. *See Doc. 29-3* at 1-2 (paragraph 6 of the affidavit). This is confusing.

First, a careful reading of the affidavit reveals that only seven of these grievances are alleged to have not been completely exhausted. Grievance N-10-06-06, the grievance concerning the May 24, 2010 excessive use of force claim is ***not*** claimed to be unexhausted. *See id.* at 3-5 (the formal grievance for the 5/24/10 incident, received and accepted June 24, 2010);

*id.* at 2 (paragraph 7 of the affidavit lists the unexhausted grievances does not mention the one accepted 6/24/10).

Second, the dates in the affidavit generally represent the date the formal grievance was "received" and/or "accepted."  But, there is no documentation for two of the grievances Defendants mention – the ones they date as November 24, 2008 and March 16, 2009.  As best I can discern, those dates are the result of editing errors, and they mistakenly describe the incident dates for one of the "April 3, 2009" grievances.  *Compare id.* at 1-2 (paragraphs 6 and 7).

Accordingly, the following are five grievances Defendants maintain are unexhausted:

!   Grievance N09-03-04 addresses a February 2009 incident where Plaintiff complained that Defendant Gatti would not give him a "holiday" package and sent it back to the sender at Plaintiff's expense.  It went through informal and formal channels and the formal grievance was accepted for consideration on April 3, 2009.  The Warden adopted the recommendation that the officer acted appropriately.  Because Plaintiff was on disciplinary status, he not eligible to receive the package, and thus was given the option of sending it home or having it destroyed.  Because Plaintiff elected the former, he was charged $22.65 to have the package sent.  *See Doc. 29-3* at 39-41.

!   Grievance N09-03-03 addresses a March 2009 incident where Plaintiff believed that someone tampered with his "legal mail" because he sent a state habeas petition for filing at a cost of $4.95, but the state court returned it at only a cost of $2.70 with some 200 pages missing.  It went through informal and formal channels and this formal grievance was also accepted for consideration on April 3, 2009.  The Warden adopted the recommendation that nothing untoward happened, because a prison employee asserted legal mail is never opened and because the prison is not responsible for errors of other agencies such as the state court.  *See id.* at 34-38.[4]

!   Grievances N-09-07-05 and N-09-07-09 address an incident that started in June 2009, where Plaintiff challenged the interpretation of a regulation concerning the length of punishment for a disciplinary infraction.  The formal grievances were ultimately received and accepted for consideration on July 7, 2009 and July 23, 2009, respectively, however, another related and

---

[4] Evidently, no one considered or investigated the possibility that a court might send a court-endorsed copy that omits hundreds of pages of attachments.

unnumbered grievance for the same matter was also received and accepted July 21, 2009.  After going back and forth through several rounds of informal and formal grievance channels, which included excusing an allegedly late filing asserted by Defendant Gatti and a difference of opinion whether the subject was grievable, eventually the Warden adopted the recommendation that the policy was properly applied and that Plaintiff's calculations were mistaken.  *See id.* at 6-29.

! Grievance N-09-06-06 addresses a June 2009 incident where Plaintiff complained that an officer cancelled recreation because of rain in the early morning, but it later turned out to be a sunny day.  Originally, Defendant Gatti rejected the informal grievance saying it was untimely, but Plaintiff's formal grievance stating that he does not control the timing of mail delivery was accepted for consideration on June 30, 2009.  Relief was denied because the officer acted appropriately in light of inclement weather.  *See id.* at 30-33.

None of the above 2009 incidents are the subject of the specific allegations in Plaintiff's Complaint.  As I noted earlier:  "Plaintiff's first claim asserts that, due to an earlier "misunderstanding" with Defendants Garcia and Bell, Defendant Garcia began a campaign of "harassment" starting in February 2010."  *Doc. 15* at 2.

## IV.  PLRA Exhaustion

It is true that the "Prison Litigation Reform Act . . . 42 U.S.C. § 1997e(a), requires that a prisoner exhaust administrative remedies before filing a § 1983 action with respect to prison conditions."  *Flores,* 370 Fed. App'x at 969; *see also, e.g. Booth v. Churner,* 532 U.S. 731, 741 (2001).  It is also true that an inmate must exhaust those remedies at each level from informal grievance through appeal of the Warden's decision.  "'An inmate who begins the grievance process but does not complete it is barred from pursuing a [federal] claim under the PLRA for failure to exhaust his administrative remedies.'"  *Flores,* 370 Fed. App'x at 969; (quoting *Jernigan v. Stuchell,* 304 F.3d 1030, 1032 (10th Cir. 2002)); *see also e.g., Thomas v. Parker,* 609 F.3d 1114, 1118-19 (10th Cir. 2010), *cert. denied,* 2011 WL 940968 (2011) ; *Little v. Jones,* 607

F.3d 1245, 1249 (10th Cir. 2010).  However, it not Plaintiff's burden to demonstrate that he initiated and completed the grievance procedure.  Contrary to Defendant's supplemental brief, the burden of establishing a lack of exhaustion lies with them, not Plaintiff.  *E.g., Jones v. Bock,* 549 U.S. 199, 211 (2007); *Gallagher v. Shelton,* 586 F.3d 1063, 1067 (10th Cir. 2009); *Roberts v. Barreras,* 484 F.3d 1236, 1240-41 (10th Cir. 2007); *see also Doc. 36* at 2-6.

## A.  *Entire Action Cannot Be Dismissed With Prejudice For Failure To Exhaust*

PLRA exhaustion is evaluated on a claim-by-claim basis.  Dismissal of the entire action is not warranted if the lack of exhaustion only pertains to certain claims.  *Roberts,* 484 F.3d at 1244 (reminder in remanding decision from this District that "under the newly announced rules of *Jones,* administrative exhaustion on one claim does not warrant dismissal of the entire action.") (citing *Jones* where it addresses the issue, 559 U.S. at 220-24); *see also, e.g., White v. Buser,* 370 Fed. App'x 947, 952 (10th Cir. 2010) (because prisoner "only exhausted his Eighth Amendment deliberate indifference claim . . . the district court correctly dismissed all of his other claims as unexhausted.").  Furthermore, dismissal for failure to exhaust is made without prejudice.  *E.g., Garcia v. Joseph,* 2010 WL 5018161 (10th Cir. 2010).

Defendants acknowledge that the excessive use of force claim is not subject to dismissal for failure to exhaust.  *See Doc. 29-3* at 1-2 (paragraphs 6 and 7); *Doc. 29* at 7 (suit barred "in whole or in part").  Also, none of the grievances for the 2009 incidents are among Plaintiff's allegations as I read his Complaint.  Thus, there is no basis to dismiss "these claims," *Doc. 29* at 9, since they are not part of the lawsuit as independent claims.[5]  Accordingly, there is no basis for Defendants demand that the entire suit be dismissed with prejudice.

---

[5] Even though they are not independent claims, these incidents may be determined to be relevant evidence of the contentious relationship and motivation for what occurred in 2010.

**B.  Defendants Ignore Plaintiff's Claim That Defendants' Interference Make The Grievance Procedure "Unavailable" To Him**

An inmate is not required to exhaust remedies that are "unavailable" to him or her.  *E.g., Little,* 607 F.3d at 1250.  Moreover, it is the obligation of this Court "'to ensure that any defects in exhaustion were not procured from the action or inaction of prison officials' before dismissing a claim for failure to exhaust."  *Id.* (quoting *Aquilar–Avellaveda v. Terrell,* 478 F.3d 1223, 1225 (10th Cir. 2007)).  "Where prison officials prevent, thwart, or hinder a prisoner's efforts to avail himself of an administrative remedy, they render that remedy 'unavailable' and a court will excuse the prisoner's failure to exhaust."  *Id.* (citing  *Lyon v. Vande Krol,* 305 F.3d 806, 808 (8th Cir.  2002) (en banc)).  For example, a "failure to respond to a grievance within the time limited contained in the grievance policy renders an administrative remedy unavailable."  *Roberts,* 484 F.3d at 1243 (internal quotations and citation to *Jernigan* omitted).

The fairly few and benign 2009 grievances documented by Defendants stand in sharp contrast to the cluster of events that occurred from late April 2010 and precipitated the instant suit in early June 2010.[6]  During the middle of those 2010 events, Plaintiff submitted a formal

---

[6]  For example, in addition to the allegations in his Complaint, with this Court's permission, Plaintiff submitted "handwritten copies" of informal grievances as amendments and attachments to the original complaint.  *See Doc. 8* at 14; *Doc. 15* at 3,4.  These documents indicate that on April 19, 2010, Defendant Garcia confiscated $20.40 worth of duplicate hygiene items Plaintiff had in his cell. Defendant Bell told Plaintiff he would be issued a "receipt" for the items when the officers could "find time" to do so, but Defendant Garcia told Plaintiff his items had been thrown away and Defendant Gatti claims the items were returned to Plaintiff.  On April 20, 2010, Defendant Garcia threatened to "write up" Plaintiff for asking for something to clean the shower with.  On April 22, 2010, after Plaintiff repurchased the items, the new items were also confiscated but this time he was issued a receipt.  He did file a grievance concerning the prior confiscated and undocumented and unreturned items.  *See Doc. 8* at 3-7. By May 5, 2010, he had not heard about his grievance so Plaintiff tried to bring this to the attention of prison authorities at the "Central Office."   It took more than two weeks for the Central Office to receive his submission.  *See Doc. 8* at 3, 5.  Meanwhile, on May 13, 2010, Plaintiff challenged the length television privileges were taken away by the Unit Management Team.  *See id.* at 8-10.  On May 24, 2010, the physical altercation between Plaintiff and Defendants erupted.  On May 25, 2010, Mr. Casaus returned Plaintiff's formal grievance to the Central Office.  *See id.* at 3.  This lawsuit followed soon

grievance directly to the "Central Office," in an attempt to bypass the Unit Manger and Grievance Officer in his institution.  In it, he alleged that they were not processing his grievances.  *See Doc. 8* at 3.  Plaintiff's verified Complaint asserts:

> Inmate rights to due process had been violated.  Inmate has constantly tried to exercise his administrative remedies by writing complaints, grievances, appeals, etc.  Unit Manager has denied Plaintiff's right to due process by law.  Unit Manager has failed to do his job as recommended by Department of Corrections . . . [by] not processing informal complaints.  Unit Manager has become corrupt as to violate inmates rights and due process [by] always not processing complaints and if by miracle complaints are processed, they are based on prejudice and bias towards Plaintiff.

> Grievance Officer Gallegos has also denied Plaintiff due process by law as to when Plaintiff filed grievance.  They are denied by Officer Gallegos  [on the ground that ] complaints were not filed when knowingly complaints were filed against Unit Manager for not processing informal complaints.  Unit Manager and Wayne Gallegos Grievance Officer continually go back and forth, playing games with Plaintiff's due process and exercising his state administrative remedies.

> Lt. Joe Pacheco when Plaintiff is escorted to see Unit Manager on a miracle for a complaint, has come out of his way to threaten  Plaintiff as to not file informal complaints or that Plaintiff's situation could really worsen.  Meaning, they will write up inmate on lies, batter or assault inmate and will get away with such an injustice if the Plaintiff continues to pursue complaints/grievances filed against his staff and Sgt. Bell in housing Unit 3B-North.

*Doc. 1* at 6, 7 (Count II starting on page 7 and continuing on page 6) (certain spelling, grammar, and punctuation supplied for clarity).

Defendants do not address, much less rebut, this claim.  It goes to the heart of exhaustion or excusing it for the specific incidents comprising the claims in the Complaint, and it alone is sufficient reason to deny dismissal on that basis.  *See Smith,* 1994 WL 59300 at * 2, n.2; *see also Doc. 24* at 3 ("It is true that the Complaint is not easy to decipher, but in preparing the *Martinez*

---

thereafter, and was file-stamped on June 6, 2010.  *See Doc. 1* at 1.

Report, counsel should consider this Court's synopsis of the claims as well as the Complaint itself.  *See Docs. 1, 15.").*

### C.  *Defendants Have Not Sustained Their Burden Of Establishing A Lack Of Exhaustion*

I do not think Defendants' are suggesting that because Plaintiff did not fully exhaust certain 2009 harassment claims, any 2010 harassment claim is barred because of that earlier failure.  Instead, Defendants seem to contend that because a review of the CMIS records only revealed the formal grievances describe above, this Court should conclude Plaintiff "never" filed any other grievances.  *Doc. 29* at 7.  There are several flaws with this argument.

First, Mr. Casaus' affidavit states that he has "access to all inmate grievance information maintained on CMIS," but does not explain what the CMIS system entails.  *Doc. 29-3* at 1.  In particular, he does not explain whether the system is devoted to the final appeals phase he coordinates or whether it contains all grievances from all institutions.

Second, the record before me suggests that Mr. Casaus's CMIS system does not have access to every grievance filed by an inmate.  For example, in the formal grievance Plaintiff filed directly with the Central Office, Plaintiff inartfully but plainly asserted that he had been complying with the grievance procedure but never received a response.  In support, he evidently attached his own handwritten "copies" of the informal grievances that were never addressed. *See Doc. 8* at 3-5.  It was Mr. Casaus himself who "returned" this grievance to Plaintiff indicating that policy required Plaintiff to "send all grievance complaints to your facility Grievance Officer and not to Central Office."  *Id.* at 3; *compare id.* (signature), *with Doc. 29-3* at 2 (signature).  Mr. Casaus' affidavit does not explain why he failed to mention this grievance. Evidently, because he did not "accept" this grievance, it was never logged into the CMIS system

he reviewed and, thus, did not need to be revealed as having been "filed."  If that assumption is correct, Mr. Casaus' omission simply strengthens Plaintiff's allegations.

Third, it may not have been correct to return this grievance without filing it.  New Mexico's policy is not completely silent on what to do in the situation where the grievance involves allegations that grievances are being mishandled.  For example, some sections expressly prohibit any "employee who is named in the grievance" from participating "in any capacity in the investigation or resolution of the grievance."  *Id.,* ¶ C.3.  Specifically, "[n]either the institutional Grievance Officer nor Administrator shall act in such a capacity when they are the subject of a grievance or a witness to an incident resulting in a grievance."  *Id.*  The grievance policy also requires "management" to "stress the importance of treating all inmate grievances as serious" and "[u]nder no circumstances will an inmate be denied the right to file a grievance."  *Policy CD-150500,* ¶ A.1 (and introductory sentence).  Thus, not only under the "plain reading" of the New Mexico grievance procedures, but also from Plaintiff's perspective, it did not make sense to essentially direct him to file with the person who was likely the subject of the grievance.  When the prison policy does not authorize the employee to reject a grievance for the reasons stated, that can be a basis to find the employee "hindered" Plaintiff's efforts and rendered the grievance procedures unavailable.  *C.f., Little,* 607 F.3d at 1250 (regulations did not authorize wholesale rejection of a grievance because it contained "more than 1 issue" thereby rendering the final appeal step "unavailable").

Fourth, it is not entirely clear from the procedures whether the institutions must maintain both informal and formal grievances.  The plain wording of the regulation is broad enough to require record keeping for both, because it does not distinguish between formal and informal grievances – "[r]ecords regarding the filing and disposition of all grievances will be collected

and maintained systematically by the Grievance Officer at each institution." *Id.*, ¶ F

(introductory sentence).  Nor do the two mandatory log formats distinguish between

"emergency" grievances and "miscellaneous" grievances.  *Id.*, ¶ F.2; *see also Attachment CD-*

*150501.A; "Attachment CD-150501.B.*  Furthermore, the Unit Manager is required to maintain

copies of "resolved" informal complains.  *See Policy CD-150501,* ¶  F.2.  This makes sense

given that the purpose for record keeping is to provide documentation of compliance with the

grievance procedures, and one of the purposes of the procedures is to resolve disputes

informally.  Maintaining copies of resolved informal complaints, coupled with the fact that the

policy does not restrict the Grievance Officer's collection and documentation responsibilities to

only formal grievances, at the very least the Grievance Officer and Unit Manager have every

incentive to document resolved informal grievances and report them to the Director.

Defendants, however, did not attach any logs to their *Martinez* Report.

Fifth, the New Mexico grievance policy leaves a gaping hole concerning unresolved

informal grievances.  The regulations evidently allow those sorts of grievances to go

unmonitored and unrecorded by the prison since the Unit Manager is not required to "maintain"

a copy of unresolved informal grievances.  Instead, those are to be "returned to the inmate to be

attached to the formal grievance."  *See Policy CD-150501,* ¶  F.2.  Yet, unresolved informal

grievances are the very sort grievances that are required to be further exhausted to comply with

the PLRA before bringing suit and it is Defendants' burden to establish a lack of exhaustion.

If an inmate does file a formal grievance, then the Grievance Officer will have a copy of

the informal grievance as well as the formal grievance and both presumably will be noted on the

logs and, presumably, CMIS.  If, however, the inmate does not file a formal grievance, then

neither the Unit Manager nor the Grievance Officer will have any documentation of the inmate's

attempt to bring an issue within the grievance process or why it went unresolved.  Defendants evidently want the Court to conclude that when they assert nothing is showing in the CMIS records, the inmate never invoked the procedures.  But, if, as alleged here, an informal or formal grievance is not documented because they are not being processed by the institution, there would also not be any record made by the institution.  Therein lies the problem.

Without the documenting submission of both informal and formal grievances, this Court cannot say with any confidence that something was ***not*** filed or not pursued fully by an inmate. What Defendants and the Court can be left with, as here, are Plaintiff's allegations that the procedures were not followed and his handwritten "copies" of informal grievances he purportedly submitted.  Those must necessarily be credited as authentic because the institution will never be in a position to discredit them without standardized and thorough record keeping procedures.  A similar situation arose in the *Roberts* case, which also involved a New Mexico penal institution.  There, the defendants "conceded that they do not maintain full records of the grievance process" that "'despite searching their records, they were unable to locate any of the institution's grievance logs or summaries,"  and thus "virtually admit[ted] that the institution's record-keeping is so incomplete that it cannot conclusively deny that Mr. Roberts filed the grievances."  *See Roberts,* 484 F.3d  at 1239, 1243.

The record keeping policy and how it is carried out does not seem to have changed from the time of the *Roberts* case.  Likewise, the *Martinez* Report before me cannot and does not conclusively establish that Plaintiff's attempts to file grievances were never interfered with.  If what is submitted with a *Martinez* Report and what is represented by the inmate's "affidavit" is "inconsistent and incomplete," this Court cannot rely on the *Martinez* Report to dismiss without prejudice for failure to exhaust.  *See id.* at 1243.  For all these reasons, either Defendants have

-15-

not sustained their burden of establishing a lack of exhaustion.

# V.  Excessive Use Of Force Claim

I cannot help but point out how very similar this case is to *Luna v. Lindsey,* CIV 09-353 MCA/CG.  There, as here, the inmate claimed that there were different stages where correctional officers inflicted physical force.  Both inmates were housed in the Penitentiary of New Mexico when the events occurred, and two defendants are common to both cases.  Both seek to recover millions in compensatory damages.  There, as here, the inmate initiated the sequence of events by admittedly engaging in prohibited conduct in the housing unit.  Inmate Luna set fire to his cell and Plaintiff kicked at Defendant Garcia while being escorted to his cell.  There, as here, many officers responded to the initial situation and, after resolving the matter in the housing unit, escorted the inmate toward the medical unit, during which the inmate claims he was beaten by the officers.  Both inmates claimed that the second physical altercation on the way to the medical unit was not provoked by them.  There, as here, a video submitted by Defendants shows only the small sequence of the inmate being escorted out of the housing unit, and there is no video of the events that took place on the way to the medical unit.  There, as here, one of the defendants' grounds for dismissal was that the injuries suffered by the inmate were *"de minimus.*"  *See id.* (Docs. 1, 41); *see also Doc. 1* at 5, 7, 10; *Doc. 29* at 12.

The Eighth Amendment has a "subjective" component and an "objective" component, both of which must be met to proceed with an excessive use of force claim under § 1983.  *E.g., Norton v. City of Marietta,* 432 F.3d 1145, 1154 (10th Cir. 2005).  Defendants argue that neither is met.

As to the subjective component, Defendants argue that "there is no evidence" the officers

"applied force in a malicious or sadistic manner for the very purpose of causing harm." *Doc. 29*
at 12; *see also Norton,* 432 F.3d at 1154.  The primary basis for Defendant's argument that there
is no evidence of improper intent is fact that Plaintiff "tried kicking Officer Garcia." *Doc. 29* at
10.

However, this argument by the Defendant ignores the temporal aspect between the two
alleged beatings, with the second occurring while being escorted to the medical unit after the
first altercation.  As I read Plaintiff's allegations and the materials in the *Martinez* Report,
however, the admitted kick only occurred in the housing unit.  *Compare Doc. 29-3* at 3
(grievance pertaining to events in medical unit), *with Doc. 29-6* at 2-3 (sealed; Plaintiff
explaining events that preceded events in medical unit) and *Doc. 1* at 5, 7 (same).  Moreover,
Plaintiff alleges that facts that can be considered an overblown reaction to the unsuccessful kick
– "I was thrown on my face to the ground while Defendant Garcia jumped on my head several
times with his knee on my head and neck area saying:  'I'll fuckin' kill you mother fucker.'" *Id.*
at 5 (punctuation and grammatical changes supplied for clarity).  As for what occurred in the
medical unit, Plaintiff alleges that Defendant Bell "slam[med]" Plaintiff's "face into a door," and
Defendant Bell and Mora would "take turns pulling Plaintiff's arm behind his back almost
breaking [it]" and took turns "placing their knee[s] on Plaintiff's head . . . jumping up and down"
while Plaintiff "pleaded" with them to "stop." *Id.* (same).  These alleged facts suggest either no
basis for the second beating or that it was in retaliation for the earlier attempted kick.

Defendants also point out minor inconsistencies between what Plaintiff recounted in his
grievance about the beating and what he recounted in his statements during the investigation that
ensued as a result of his grievance and in his Complaint. *See Doc. 29* at 10-11.  I also note that
the investigation revealed one witness who claimed that Plaintiff was verbally combative and

attempted to spit on the officers while he was being escorted to the medical unit.  In fact, the lack

of a video camera in the medical unit and the inconsistent accounts (not only between  Plaintiff

and the officers, but also between the officers) about what happened, led the officer who

prepared the special internal affairs investigation report to issue an "inconclusive" finding about

whether excessive force had taken place in the medical unit.  *See Doc. 29-6* at 3, 13 (sealed).

But, these inconsistencies go to credibility, an issue that cannot be decided on summary

judgment.[7]

As for the objective component, Defendants assert that the injuries Defendant sustained

were "*de minimus.*"  Their argument fails a matter of fact and law.

Defendants did not submit Plaintiff's medical records with the Martinez Report.  In

support of their argument that the injuries Plaintiff suffered were "*de minimus,*" they submitted

the affidavit of a physician who reviewed certain medical records – Doctor Stephen A. Vaughn,

the Medical Director for the New Mexico Corrections Department.  *See Doc. 29-8.*  Dr.

Vaughn's original conclusion was that Plaintiff only suffered a nosebleed, and he offered his

opinion that the cause was "trivial trauma or even inapparent events" such as the dry New

Mexico climate or "nosepicking."  *Id.* at 2; *see also id.* ("My impression from the medical record

is of an inmate complaining of an alteration, who appeared with a minor, common and self-

resolving nosebleed of uncertain etiology.").  Later, Dr. Vaughn discovered that he had not

---

[7]  *See, e.g., Norton,* 432 F.3d at 1154 ("the facts relevant to both the objective and subjective
elements of the excessive force test are hotly contested . . . The district court concluded that 'the intent
was to restrain the Plaintiff until he was willing to comply with jailhouse rules [and it was the inmate
who] created the necessity for the use of force' . . .  the district court could not have reached these
conclusions unless it chose to believe defendants over plaintiff.  However, a judge may not evaluate the
credibility of witnesses in deciding a motion for summary judgment. . . .  In cases which involve delving
into the state of mind of a party, the granting of summary judgment is especially questionable.") (omitting
other internal quotations and citation to *Seamons v. Snow,* 206 F.3d 1021, 1026 (10th Cir. 2000)).

reviewed all of the pages of the medical record from the date the beating took place – May 24,

2010.  After reviewing that other page, he revised his affidavit.  The new affidavit reports that, in

addition to the nosebleed, Plaintiff suffered a wrist sprain and superficial abrasions.  He was sent

for wrist and skull x-rays, which were normal.  *See Doc. 36-1* at 2.  Dr. Vaughn's new opinion,

as of January 2011, is that these injuries are "consistent with the trauma of a takedown" and that

"they are likely to fully resolve without disability."  *Id.* at 3.  It is clear that Dr. Vaughn has

never examined Plaintiff, and fairly evident that he has never been made aware of the internal

investigation report.  In any event, his medical opinions do not establish *de minimus* injury as a

matter law.

     None of the cases Defendants cite in support of their arguments post-date 2006.  Also,

Magistrate Judge Carmen E. Garza's proposed findings in the *Luna* case were withdrawn

because attorney Todd Coberly entered an appearance for the Plaintiff there.  Nevertheless, her

discussion of recent developments in the Supreme Court and Tenth Circuit concerning

"*de minimus*" arguments in Eighth Amendment excessive use of force cases is instructive:

>      It is true that not every push or shove by a prison guard will amount
> to a violation of the Eighth Amendment. It is also true that Plaintiff did not
> suffer any broken bones or needed stitches. Defendants thus argue that
> because the injuries here were "*de minimus*," the case should be dismissed.
> *See Doc. 37* at 9.  The very case Defendants cite, however, itself holds that
> the "blows directed at [the inmate], which caused bruises, swelling,
> loosened teeth, and a cracked dental plate, ***are not de minimis*** for Eighth
> Amendment purposes." *Hudson v. McMillian,* 503 U.S. 1, 10 (1992)
> (emphasis added).  Moreover, the question in *Hudson* was whether "force
> against a prisoner may constitute cruel and unusual punishment when the
> inmate ***does not*** suffer serious injury" and the Court answered "yes." *Id.* at
> 4 (emphasis added).
>
>      To the extent there was any doubt about the scope of *Hudson,* the
> Court recently reversed a decision that dismissed a prisoner's excessive use
> of force action because the injuries were "*de minimus.*"  *Wilkins v. Gaddy,*
> ___ U.S. ___, ___, 130 S. Ct. 1175, 1178 (2/22/10) (per curiam).  Aside

from noting that the Tenth Circuit is one of the circuits that has rejected a "*de minimus*" threshold, the *Wilkins* decision reiterated that when

> prison officials maliciously and sadistically use force to cause harm, . . . contemporary standards of decency always are violated . . . whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury. . . .
> *****
> Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury. . . .
> *****
> The Fourth Circuit's strained reading of *Hudson* is not defensible. This Court's decision did not, as the Fourth Circuit would have it, merely serve to lower the injury threshold for excessive force claims from "significant" to "non-de minimis" - whatever those ill-defined terms might mean. Instead, the Court aimed to shift the "core judicial inquiry" from the extent of the injury to the nature of the force - specifically, whether it was nontrivial and was applied . . . maliciously and sadistically to cause harm. . . . To conclude, as the District Court did here, that the absence of "some arbitrary quantity of injury" requires automatic dismissal of an excessive force claim improperly bypasses this core inquiry. . . .

*Id.* at 1178-79 (other internal quotations and citations omitted); *see also id.*, n.2 (citing *United States v. LaVallee,* 439 F.3d 670 (10th Cir. 2006), which holds "we decline to adopt a rule today, which we believe would be inconsistent with *Hudson*, that permits an officer to beat an inmate so long as the resulting injuries are neither permanent nor require medical attention.").  Plainly, there is no basis to grant Defendants a dismissal based on their *"de minimus"* argument.

That does not mean that the extent of Plaintiff's injuries is wholly irrelevant.  To prevail on his excessive use of force claim, Plaintiff "will ultimately have to prove not only that the assault actually occurred but also that it was carried out maliciously and sadistically rather than as part of a good-faith effort to maintain or restore discipline." *Wilkins,* 130 S. Ct. at 1180 (internal quotations and citation omitted).  The degree of injury is "one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation." *Id.* at 1178 (internal quotations

and citation omitted); *see also LaVallee,* 439 F.3d at 688 ("we recognize that the degree of injury may be highly relevant to the determination of the unreasonableness of the force used"); *id.* at 687 (*Hudson* explained that 'the extent of injury suffered by an inmate is [but] one factor that may suggest' whether the force applied was necessary or wanton").  Plaintiff's minimal injuries may also have consequences for recovery of damages. [and in footnote]  Plaintiff demands $500,000 in compensatory damages "against each defendant, jointly and severally," plus $500,000 in punitive damages "against each defendant." *Amended Complaint* at 27.  He thus hopes to recover millions of dollars, but "the relatively modest nature of his alleged injuries will no doubt limit the damages he may recover." *Wilkins,* 130 S. Ct. at 1180.

*Luna v. Lindsey,* CIV 09-353 MCA/CEG (Doc. 41 at 3-5); *see also Fisher v. City of Las Cruces,* 584 F.3d 888, 904 (10th Cir. 2009) (Gorsuch, Circuit Judge, concurring in the judgment) ("how can we explain that free citizens must prove injuries to prevail on excessive force claims under the Fourth Amendment in light of the Supreme Court's and our own refusal to require convicted felons to prove injuries to prevail on similar claims under the Eighth Amendment?") (citing *Hudson* and *LaVallee*).  Thus, Defendants' attempt to establish a minor injury are no basis to dismiss the excessive use of force claim.

## VI.  Referral To *Pro Se* Civil Litigants Selection Committee

Plaintiff is proceeding *in forma pauperis* under 28 U.S.C. § 1915.  *See Doc. 6.* Under § 1915(e)(1), this Court "may request an attorney to represent any person unable to afford counsel."   Although "[p]risoners alleging civil rights violations have no constitutional right to counsel . . . the district court may appoint counsel if it determines doing so would be appropriate." *Hoffman v. Martinez,* 92 Fed. App'x 628, 633-34 (10th Cir. 2004) (citing *Bethea v. Crouse,* 417 F.2d 504, 505 (10th Cir. 1969)); *see also e.g., Pinson v. Equifax Credit Information Servs., Inc.,* 316 Fed. App'x 744, 749 (10th Cir. 2009) (citing *Johnson v. Johnson,* 466 F.3d 1213, 1217 (10th Cir. 2006) (per curiam)), *cert. denied,* 130 S. Ct. 3365 (2010).  Whether or not an

inmate demands a jury is not conclusive of the question.  *See Rucks v. Boergermann,* 57 F.3d 978, 979 (10th Cir. 1995) (affirming denial of counsel to *pro se* litigant where case was tried to jury and listing factors to consider in "whether to appoint counsel, including 'the merits of the litigant's claims, the nature of the factual issues raised in the claims, the litigant's ability to present his claims, and the complexity of the legal issues raised by the claims.") (quoting *Williams v. Meese,* 926 F.2d 994, 996 (10th Cir. 1991)).  The "restraints placed upon [a Plaintiff] by [his or her] confinement" is a factor to consider and the one I find to be determinative here. *Tabron v. Grace,* 6 F.3d 147, 156 (3rd Cir. 1993) (also cited in *Rucks* for factors to be considered), *cert. denied,* 510 U.S. 1196 (1994).

This District has a selection committee that can ascertain whether an attorney would be willing to accept the case without charge.  *See* DISTRICT OF NEW MEXICO, GUIDE FOR PRO SE LITIGANTS at 9-10 (December 2010).  Given that Plaintiff is presently incarcerated, I find it appropriate to determine whether an attorney would be willing to take the case.  Because this case is so similar to the *Luna* case, however, I also recommend that the Committee to first ask Todd Coberly whether he be interested in taking this matter.

Wherefore,

**IT IS HEREBY RECOMMENDED AS FOLLOWS:**

1.  Defendants' motion to dismiss *(Doc. 30)* be construed as a motion for summary judgment and denied;

2.  This matter be referred to Court's *Pro Bono* Selection Committee for possible appointment of Todd Coberly as counsel and, if he is unavailable, whether another attorney would be willing to take the case; and

3.  After the Court attempts to secure counsel for Plaintiff and ascertains whether the parties desire to engage in settlement negotiations, the action proceed to trial.

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

_____
UNITED STATES MAGISTRATE JUDGE